No. 57.—JOHN M. FREEMAN, administrator of Jas. W. Aaron, plaintiff in error, *vs.* LEVISA FLOOD, defendant.

[1.] No particular form of words is necessary to create a separate estate in a married woman. It is enough, if there be a clear intention to exclude the marital rights of the husband. Subject to this rule, the words " I give to my daughter V W two negroes, to-wit: Sally and Dicey, to remain in her possession, and for her special use and benefit during her natural life, and at her death, to go to her children forever, and to no other use what-

Freeman, administrator, *vs.* Flood.

ever," create a separate estate in V W; especially when their meaning is aided by other features of the will.

[2.] Neither is any particular form of words necessary to restrain the aliena-tion of such an estate: but the intention must be clear. And subject to this rule, the words "to no other use whatever," explained by other words in the will, and associated in the same sentence with the words "to remain in her possession," &c. operate as a restraint upon alienation.

[3.] Where, shortly after the marriage of the daughter of B, and when she and her husband were about leaving for home, B brought out a negro girl slave, and said, "Here is this girl; you can take her home with you; she is not worth much; she will do to pick up chips; I do not give her to you now, but I never expect to take her back": *Held,* that these words did not amount to a gift of the slave, who was afterwards bequeathed to the daugh-ter in the will of B.

[4.] A daughter who permits a negro slave which has been settled upon her by the will of her father, as her separate property, and with restraint upon her power of alienation, to go into the possession of a son-in-law, is not es-topped from asserting her right to the same, as against the administrator of that son-in-law.

Trover, in Franklin Superior Court. Tried before Judge JACKSON, October Term, 1854.

This was an action brought by Levisa Flood to recover a negro.

The plaintiff introduced in evidence the will of her father, John Bellamy, who died in 1829, and whose will had been regularly proven, &c.

The will contained several items.

The 1st was to his wife, of certain property, "during her nat-ural life or widowhood." The 2d, 3d, 4th and 5th items were bequests to different sons in the usual words, without any pe-culiar expression. The 6th was in these words: "I give my daughter Lucy two negroes, to-wit: a woman and one boy child named Berry; also one feather bed, to remain in her pos-session and for her special use and benefit, during her natural life; and at her death to go to her children, together with the increase of the woman forever, and by no means to be disposed of in any other manner whatever."

The 7th item was, "I give to my daughter, Patsey Brauner, (certain land described) also one negro woman and child now in her possession, named Mary, to remain in her possession and special use and benefit during her natural life, and at her death, to go to her children forever, and to no other use whatever."

The 8th item, which is the one now in question, is as follows: " I give to my daughter, Visey Westbrook, (who is Mrs. Flood, the present plaintiff,) two negroes, to-wit: Sally and Dicey, to remain in her possession, and for her special use and benefit, during her natural life ; and at her death, to go to her children forever, and to no other use whatever."    The 9th item was, "I give to my daughter, Elizabeth Bellamy, two negro girls, named Kitty and Anna, also one feather bed and furniture."

The remaining items were bequests to sons and grand-sons, and had no peculiar expressions.

The plaintiff proved that the Visey Westbrook named in the 8th item of the will was herself; that the negro Catherine now sued for was the child of Sally, mentioned in said item; that said Sally, about the year 1818, belonged to, and was in the possession of said John Bellamy; that about that time (his daughter Levisa having been married about a month to Joshua Westbrook, and having gone to live at their own house, but being on a visit to her father's with her husband) Mr. Bellamy brought out the girl, and said to his daughter, as she and her husband were about to start home, "here is this girl; you can take her home with you ; she is not worth much, but may do you some good; she will do to pick up chips; I do not give her to you now, but I never expect to take her back."

The said negro Sally remained in the possession of West- brook and his wife, until his death ; and the plaintiff intermar- ried with John L. Flood, who is also dead; that the negro Catherine was in possession of plaintiff while a widow, and af- ter her last marriage.

The plaintiff closed, and the defendant stated the proof which he expected to make ; and it was consented that the case should be withdrawn from the Jury, and the judgment of the Court pronounced upon the plaintiff's proof, and that offer-

ed by the defendant, which was thereupon stated by Counsel as follows:

That the negro woman Sally had been in possession of Westbrook and his wife ten or twelve years before the death of old Mr. Bellamy; that Joshua Westbrook exercised acts of ownership over her as his own, as long as he lived; that after his death the plaintiff intermarried with John L. Flood; that in the year 1845, the girl Catherine went into the possession of James W. Aaron, who married a daughter of plaintiff, by her first husband, Westbrook; that she went there by consent of the plaintiff, and remained in the possession of said Aaron during his life, and that defendant is his administrator, and has had said negro in possession ever since; that said Aaron departed this life in 1850; and also, that it was at the express suggestion of plaintiff that said girl went into the possession of her son-in-law and daughter; that several other children had married off in the same way, and had had negroes given them upon their marriage, by the solicitation of the plaintiff; and he offered further to prove, that said plaintiff had urged the sale of Sally and her children to others.

The Court held that the 8th item of the will of John Bellamy created in the plaintiff a separate estate for her life, restraining the power of alienation; that the words of Mr. Bellamy, in placing the negro Sally in his daughter's possession, reserved the right of property in himself, and constituted the proceeding a loan and not a gift; that Westbrook's possession was Bellamy's possession; and all ordinary acts of ownership, such as working and using the negro as his own, on the part of Westbrook, could not set up title in him against Bellamy; that in order to get title by the Statute of Limitations, it would be necessary for defendant to show that Westbrook set up title to the negro, independent of the loan, and notified Bellamy thereof; and that the present plaintiff is not estopped by her consent, express or implied in her husband's presence, to the arrangement by which she was dispossessed.

To which rulings of the Court, the defendant excepted.

C. PEEPLES; NASH, for plaintiff in error.

COBB & HULL; T. R. R. COBB, for defendant.

*By the Court.*—STARNES, J. delivering the opinion.

It is unnecessary for us to consider that vexed question of law which was brought to our attention, and which involves the consideration of a married woman's right to dispose of her separate estate, as a *feme sole*, where she is not restrained by the instrument creating it; for in our opinion, the terms of John Bellamy's will do restrain the right of his daughter, Mrs. Westbrook, to alienate the slave in question.

[1.] The first question on which it is proper for us to express an opinion is, whether or not the language used by the testator, John Bellamy, in the bequest of the mother of the slave in controversy, created a separate estate in his daughter, the defendant in error.

Pursuing rules proper for the construction of such instruments, let us examine this will of John Bellamy in its different features, and gather therefrom, if it be possible, the intention of the testator in this respect.   Such an examination will show, we think, that in the 1st clause of his will, he has made a provision in favor of his wife, without any words of limitation. By the 2d, 3d, 4th, 5th, 10th, 11th, 12th, and 13th clauses, he has made bequests to his sons and grand-sons in like manner.   In the 9th, he has given property to an unmarried daughter, without any such restriction.   In the 6th, 7th, and 8th, clauses he has bequeathed property to three of his daughters, with limitations and restrictions, very similar in character.   These restrictions are *to the special use and benefit* of these daughters, and *to no other use, or to be disposed of in no other manner whatever*.

Now two of these three daughters, as the record shows, were married; and the probability is, the other was so as the testator refers to her children.   And as we find these restrictions im-

posed by the testator just where he is making provisions for married daughters, and no where else, the inference is a fair one, that he designed thereby to give a separate estate to these daughters.

Taking into consideration the fact, that no particular form of words is necessary to create a separate estate in a married woman; that it is enough if there be a clear intention to exclude the marital rights of the husband, let us examine this bequest more particularly. The language used is, " I give to my daughter Visey Westbrook, two negroes, to wit: Sally and Dicey, to remain in her possession, and for her special use and benefit, during her natural life; and at her death, to go to her children forever, and to no other use whatever". These words, "for her special use and benefit, during her natural life," taken in connection with the other words employed, are appropriate to the creation of a separate estate. It is true, that *special* use does not signify *separate* use; but a special use in a married woman, which is given to be enjoyed by her during her natural life, and to be taken or disposed of to no other use whatever, excludes, of course, the marital rights, and must necessarily be a separate use.

By looking to adjudicated cases, we find that similar words have been considered as significant of an intention to create a separate estate.

In *Darley vs. Darley*, (3 *Atk.* 399) the words, "for her own livelihood," were deemed sufficient for this purpose. In *ex-parte Ray*, (1 *Madd.* 119) this meaning was supposed to be expressed by the words, "For her sole use". In *Heathstone vs. Hall*, (3 *Ired.* 414) the words, "In trust for the entire use, benefit, &c. were said to create a separate estate. In *Newman vs. James*, (12 *Ala.* 29) this intention was said to be manifested by the words, " To have and to hold the same to and for her use, benefit and right, &c. without let, hindrance or molestation". " To be for her and her family's use, during her natural life, and her children, to enjoy it after her death," was the language which was held to have such import in a case in Pennsylvania. (5 *Barr.* 385.) " To her own proper use," were

words considered of a similar signification.   (10 *Barr.* 423.)
None of these words, in our opinion, more strongly indicate an
intention to create a separate estate, than those used in the case
before us, especially when they are taken in connection with
all the terms and provisions of the will.

[2.] We are next called upon to inquire, whether or not
there are, in this bequest, words which were intended to oper-
ate as a restraint upon the alienation of the slaves bequeathed.

Here again no particular form of words is necessary; but the
intention must be clear.   The intention is clear, we think, in
this bequest, and is manifested, in the first place, by the words
" to no other use whatever".

On looking to the 6th clause of this will, we find the pro-
perty given to the daughter, " to her special use and benefit,"
&c. "and by no means to be disposed of in any other manner
whatever".   In the 7th and 8th clauses the testator substi-
tutes, in the place of these latter words, the phrase, "and to
no other use whatever".   Now we think that he employed these
two phrases in the same sense, and supposed them to have the
same import.   They occur in clauses otherwise similar, (except
as to the names and the property conveyed); they were be-
quests to his married daughters, as we suppose; they are of kin-
dred import, and it seems quite reasonable to conclude that he
intended the two to have the same signification.   But it is ad-
mitted for the plaintiff in error, that the words, " by no means
to be disposed of in any other manner whatever," operate as a
restraint upon alienation.   And so we think do the similar
words, " to no other use whatever," which we have shown were
probably used by the testator, as synonymous with these.

It was suggested by the Counsel for the plaintiff in error,
that these words, " to no other use whatever" were probably
applied by the testator to the gift in remainder to the children,
and were intended to have the effect of creating an estate in a
particular class of heirs, or a perpetuity.   These are not very
apt words for such a purpose, and to adopt this construction,
would be to look away from a construction which imputes an
intention to the testator consistent with law; and reasonable,

to one which attributes an illegal intention to him, and which, under the circumstances, is unreasonable.

In the next place, in this connection, some importance is to be attached to the words, " to remain in her possession," &c. If it were intended, thereby, that the daughter was not to part with these slaves, but they were to remain in her possession during her life, of course this would be inconsistent with the power of alienation.

This construction may be considered weakened by the fact, that one of these slaves was already in possession of testator's daughter, Mrs. Westbrook, and it may be supposed that he intended to provide only that she should retain possession of this slave. But the same terms were applied to others (to Dicey, for example) who were not in possession of testator's daughters, so far as we can tell from this record.

Taking all these things together, we think the intention of this testator, to restrain the alienation of these slaves by his daughter, quite clear.

[3.] The Statute of Limitations did not protect this plaintiff in error, for the very satisfactory reasons assigned by his Honor, Judge JACKSON; and as he has shown, the words and conduct of John Bellamy did not amount to a gift of the slave to his daughter and her husband, Mr. Westbrook, and could not properly be considered as more than a loan of the same.

[4.] It was insisted that the defendant in error was estopped, by her own acts, from denying the title of the plaintiff in error, to the slave Catherine, as representing his intestate, and that such denial was a fraud upon his intestate's estate.

This cannot be, if Mrs. Flood was prohibited by the will of her father from parting with this property. That will was the law by which she held the slave, and if it forbade her to alienate the same, or to part with her to any person, and yet she did it, that act was without authority, and no title was taken by her son-in-law and daughter. It was to prevent the married woman possessing a separate estate, from conveying away, or parting with the same, that this restraint upon alienation was devised. In tender regard to her situation, it was design-

ed that she should not be influenced to part with her property to any one. If it were permitted at all, under many pretences or evasions, it would be easy, if her own generous and devoted heart did not prompt it, for an embarrassed or unprincipled husband to influence her to dispose of it for his relief or benefit. Hence, the rule which I have stated. Very little would be gained by such a rule, however, if the wife who did part with her separate property, was ever after estopped thereby from denying the title of the person who might be in possession of it; for in such event, that might always be done by circuity which could not be done directly; and all advantage of restraints upon alienation would be wholly destroyed. Judgment affirmed.